# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ADF, INC,<br>Individually and on Behalf of all Others<br>Similarly Situated,<br><br>        Plaintiff,<br><br>        vs.<br><br>ARKEMA INC.; ARKEMA S.A.; SARTOMER<br>COMPANY, INC.; TOTAL S.A.; BASF A.G.;<br>BASF CORPORATION; DEGUSSA<br>CORPORATION; DEGUSSA A.G.; RÖHM<br>GmbH & CO. KG; RÖHM AMERICAS LLC;<br>CYRO INDUSTRIES; CYTEC INDUSTRIES;<br>IMPERIAL CHEMICAL INDUSTRIES PLC;<br>LUCITE INTERNATIONAL LIMITED;<br>LUCITE INTERNATIONAL, INC.; and<br>ROHM and HAAS COMPANY,<br><br>        Defendants. | CIVIL ACTION NO._____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff ADF, Inc., individually and on behalf of a Class of all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants, demanding a trial by jury, and complaining and alleging as follows:

## NATURE OF THE CASE

1.    This lawsuit is brought as a class action on behalf of all individuals and entities who purchased methyl methacrylate ("MMA") in the United States directly from Defendants, their predecessors or their controlled subsidiaries and affiliates from January 1, 1995 through December 31, 2003 (the "Class Period").  Plaintiff alleges that during the Class Period the

#113045

Defendants conspired to fix, raise, maintain or stabilize prices of, and to restrict output for, MMA sold in the United States and worldwide. Because of Defendants' unlawful conduct, Plaintiff and other Class members paid artificially inflated prices for MMA and, as a result, have suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

2.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.      This action is also instituted to secure injunctive relief against Defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

4.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

5.      Venue is found in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d). Venue is proper in this judicial district because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in, this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out in, this district.

6.      Upon information and belief, Defendants maintain offices, have agents, transact business, or are found within this judicial district.

7.      This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each Defendant: (a) transacted business in the United States; (b) directly or indirectly

manufactured, sold, shipped and delivered substantial quantities of MMA throughout the United States; (c) had substantial aggregate contacts with the United States as a whole; and/or (d) was engaged in an illegal price-fixing and output-limiting conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this district. Further jurisdictional facts as to certain foreign Defendants are alleged below.

## DEFINITIONS

8.     As used herein, the term:

a.     "MMA" means methyl methacrylate, a chemical compound known as a monomer used in the production of polymethyl methacrylate acrylic plastics and in other applications.

b.     "Person" means any individual, partnership, corporation, association or other business or legal entity; and

c.     "Class Period" refers to the period from January 1, 1995 through December 31, 2003.

## PLAINTIFF

9.     Plaintiff ADF, Inc. is a Wisconsin corporation with its principal place of business in Ladysmith, Wisconsin.   Plaintiff purchased MMA directly from one or more of the Defendants during the Class Period.   The prices that Plaintiff paid to Defendants or their co-conspirators for MMA were greater than they would have been absent the conspiracy herein alleged. As a result of the alleged conspiracy, Plaintiff was injured in its business and property

by reason of the antitrust violations alleged herein. Plaintiff asserts a claim on behalf of itself and all direct purchasers of MMA from one or more of the Defendants during the Class Period.

## DEFENDANTS

10.     Defendant Arkema Inc. ("Arkema Inc."), formerly known as Atofina Chemicals, Inc. and Elf Atochem North America, Inc., is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. During the Class Period, Arkema Inc., either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district. Arkema Inc. manufactures and markets, through the Acrylics Business Unit of Arkema Group, the Norsocryl® brand of acrylic monomers, which includes, according to its website, "Methyl Methacrylate (MMA), the most common methacrylate."

11.     Defendant Arkema S.A., formerly known as Atofina S.A. and Elf Atochem S.A., is a French corporation with its principal place of business in Puteaux, France. Arkema S.A. has indirectly owned Arkema Inc. In 2000, following TotalFina S.A.'s acquisition of Elf Aquitaine, S.A., the chemical operations of the combined company were renamed Atofina Chemicals S.A. In October 2004, Atofina Chemicals, S.A. was renamed Arkema S.A. During the Class Period, Arkema S.A., either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

12.     Defendant Sartomer Company, Inc. ("Sartomer"), with its principal place of business in Exton, Pennsylvania, is a subsidiary of Defendant Total S.A. and part of its chemical branch. Sartomer's website claims that it is the "premier global supplier of acrylate/methacrylate monomers. . . ." During the Class Period, Sartomer, either directly or through its predecessors,

successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

13.    Defendant Total S.A. ("Total"), formerly known as TotalFinaElf S.A. and Total, S.A., is a French corporation with its principal place of business in Courbevoie, France. Total has been the ultimate parent of Arkema S.A. and Arkema Inc. Before June 1999, Total operated under the name Total, S.A. From June 1999 through March 2000, Total operated as TotalFina, S.A. Following its acquisition of the controlling interests of Elf Aquitaine, S.A., Total was renamed TotalFinaElf S.A. and operated under that name until May 2003, when TotalFinaElf S.A. was renamed Total, S.A. During the Class Period, Total, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

a.    Total identifies itself on its website as a "leading multinational energy company with 111,401 employees and operations in more than 130 countries." Boasting that it is "a world-class chemicals manufacturer," Total asserts that its "chemicals business is a European or world leader in each of its markets," with Europe accounting for 58% of its sales, the United States accounting for 25% of such sales, and the remaining sales generated predominantly in Asia and Latin America. Thus, by Total's calculation, the United States accounts for one quarter of Total's entire chemicals business. Total's MMA business is encompassed within its chemicals business.

b.    Upon information and belief, Total dominated and controlled the finances, policies and business practices of Defendants Arkema Inc., Arkema, S.A., and Sartomer relating to the antitrust violations alleged in this Complaint, which injured Plaintiff and members of the Class. Plaintiff's claims arise out of Total's contacts with this district. Total knew, or had good reason to know, that its conduct would have injurious effects in this district.

5

14.     BASF A.G. ("BASF") is a global chemical company with its principal headquarters in Ludwigshafen, Germany. During the Class Period, BASF, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.  BASF's website claims that its Acrylic Monomers division has a "global presence."  At least one manufacturing plant for BASF's acrylic monomers is located in the United States, in Freeport, Texas. Defendant BASF Corp.'s website, under the heading "BASF Corporation -- Businesses and Products," asserts that "[t]he BASF Group's operations in North America virtually encompass BASF's entire product range[,]" including 'Acrylic Monomers.'"

a.     Upon information and belief, BASF dominated and controlled the finances, policies and business practices of Defendant BASF Corp. relating to the antitrust violations alleged in this Complaint, which injured Plaintiff and members of the Class. Plaintiff's claims arise out of BASF's contacts with this district, and BASF knew, or had good reason to know, that its conduct would have injurious effects in this district.

15.     BASF's North American subsidiary, BASF Corporation ("BASF Corp."), maintains its headquarters in Florham Park, New Jersey.  During the Class Period, BASF Corp., either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

16.     Defendant Degussa Corporation ("Degussa Corp."), formerly known as Degussa-Hüls Corporation, is an Alabama corporation with its principal place of business at 379 Interpace Parkway, Parsippany, New Jersey 07054.  Degussa Corp. is a wholly owned subsidiary of Defendant Degussa A.G.  During the Class Period, Degussa Corp., either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

6

17.    Defendant Röhm GmbH & Co. KG ("Röhm"), located in Darstadt, Germany, is Defendant Degussa A.G.'s MMA division. Following a 1998 merger between Degussa and Hüls, their respective MMA divisions, Agomer GmbH and Röhm, were also merged (taking the Röhm name). During the Class Period, Röhm, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

18.    Defendant Röhm Americas LLC ("Röhm Americas"), located at 2 Turner Place, Piscataway, New Jersey 08855, is a subsidiary of Degussa Corp. and the American affiliate of Röhm. During the Class Period, Röhm Americas, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

19.    Defendant Cyro Industries ("Cyro"), maintains headquarters at 100 Enterprise Drive, Rockaway, New Jersey. Cyro, a wholly-owned subsidiary of Defendant Degussa Corp, was established as joint venture between Defendant Degussa A.G. and Defendant Cytec Industries in 1976. On May 10, 2005, Defendant Degussa A.G. announced that it would purchase Cytec's interest in Cyro and merge the venture into its own acrylics production for the Americas. Cyro's website states that Cyro is the "North American arm of the Röhm /Degussa team." Cyro currently operates four industrial plants manufacturing MMA, among other products. During the Class Period, Cyro, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

20.    Defendant Degussa A.G., formerly known as Degussa-Huls A.G., is a German corporation with its principal place of business in Dusseldorf, Germany. During the Class Period, Degussa A.G., either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

21.     Upon information and belief, Degussa A.G. dominated and controlled the finances, policies and business practices of Defendants Degussa Corp., Röhm, Röhm Americas, and Cyro relating to the antitrust violations alleged in this Complaint, which injured Plaintiff and members of the Class. Plaintiff's claims arise out of Degussa A.G.'s contacts with this district, and Degussa A.G. knew, or had good reason to know, that its conduct would have injurious effects in this district.

22.     Defendant Cytec Industries ("Cytec") is a specialty chemicals and material technology company incorporated in Delaware with its principal place of business at Five Garrett Mountain Plaza, West Paterson, New Jersey. In June, 2005, Cytec announced that it had sold its 50% share of the Cyro joint venture to Degussa. During the Class Period, Cytec manufactured, marketed and/or sold MMA in the United States either directly or through its predecessors, successors, affiliates and/or subsidiaries, including the Cyro joint venture.

23.     Defendant Imperial Chemical Industries PLC ("ICI") is a United Kingdom-based manufacturing company with its principal place of business at 20 Manchester Square, London, England. ICI began its MMA production in a joint venture with DuPont in 1930. In 1993, ICI took sole possession of the acrylics and MMA-producing business, including manufacturing plants in Beaumont, Texas and Memphis, Tennessee. Before 1999, ICI had been, according to its website, "the world leader in methacrylates." During the Class Period, ICI, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district. ICI's U.S.-produced MMAs were manufactured and marketed by its ICI Americas, Inc. division, which in turn owned ICI Acrylics, Inc., headquartered in Memphis, Tennessee. In February 1999, ICI Americas sold its stock to Charterhouse Development Capital, forming Ineos Acrylics Ltd. Ineos continued its U.S. presence in Memphis and in 2002 was rebranded Lucite International.

24.     Defendant Lucite International Limited ("Lucite"), the successor to the MMA and acrylic businesses of DuPont and ICI, has its principal place of business at Queens Gate, Queens Terrace, Southampton SO14 3BP, United Kingdom.   On its website, Lucite boasts that it is a "global leader in the design, development and manufacture of acrylic-based products. It is the energy and driving force behind two of the world's best-known contemporary material brands Lucite® and Perspex®." The company's website claims that Lucite is "is the world's leading supplier of Methyl Methacrylate (MMA) and the only organisation with production, research and development, sales and marketing facilities in all three major geo-economic regions – the Americas, Europe and Asia." Lucite says that it "has 25% market share in MMA by volume with over 600 kte of capacity." Lucite maintains production facilities in both the United States and Europe. During the Class Period, Lucite, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

a.     Upon information and belief, Lucite dominated and controlled the finances, policies and business practices of Defendant Lucite International, Inc. relating to the antitrust violations alleged in this Complaint, which injured Plaintiff and members of the Class. Plaintiff's claims arise out of Lucite's contacts with this district, and Lucite knew, or had good reason to know, that its conduct would have injurious effects in this district.

25.     Lucite's North American affiliate, Defendant Lucite International, Inc. ("Lucite USA"), is a Missouri corporation with its principal place of business at 7275 Goodlett Farms Parkway, Cordova, Tennessee.   During the Class Period, Lucite USA, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

9

26.     Defendant Rohm and Haas Company ("Rohm and Haas") is a Delaware corporation, with its headquarters in Philadelphia, Pennsylvania.  Rohm and Haas bills itself as the "world's largest acrylic monomer manufacturer" and the "world's leading supplier of monomers, including acrylates, methacrylates and specialty monomers for sale around the world...." Rohm and Haas had two acrylic joint ventures with Atofina predecessor Elf Atochem, AtoHaas and NorsoHaas. As alleged above, AtoHaas was created in 1992 as a joint venture between Rohm and Haas and Elf Atochem in the United States, Europe, and Asia to manufacture, market, and distribute acrylic sheets and resins on a worldwide basis. In 1998, Rohm and Haas sold its 50% stake in the AtoHaas joint venture to its joint venture partner, Elf Atochem.  The NorsoHaas joint venture was formed in 1989 for the production and sale of acrylic-based products to the detergent industry, among others.  In 1998, Elf Atochem sold its 50% stake in the NorsoHaas joint venture to its partner, Rohm and Haas.  During the Class Period, Rohm and Haas, either directly or through its predecessors, successors, and/or affiliates, manufactured, marketed and/or sold MMA in the United States and in this district.

27.     Whenever this Complaint makes reference to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

## CO-CONSPIRATORS

28.     Various other persons, firms and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein,

and have aided, abetted and performed acts and made statements in furtherance of the conspiracy.

## INTERSTATE AND FOREIGN TRADE AND COMMERCE

29.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

30.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate and international commerce.

31.     During the time period covered by this Complaint, Defendants and their co-conspirators sold and distributed MMA to and throughout the United States.

32.     Each of the Defendants and their co-conspirators used instrumentalities of interstate and/or foreign commerce to manufacture, sell, distribute and market MMA.

33.     Defendants and their co-conspirators manufactured, sold and shipped substantial quantities of MMA in a continuous and uninterrupted flow of interstate and foreign commerce to customers located in states and nations other than the states and nations in which Defendants produced MMA.

## THE MMA INDUSTRY

34.     MMA is a slightly-water soluble liquid historically derived from acetone, HCN and isobutylene, themselves by-products of other chemical processes.  Methacrylates such as MMA polymerise to form resins and polymers with optical clarity, strength and durability – and especially in all weather or corrosive environments.  MMA can also be co-polymerised with other monomers to form a broader range of products typically used for paints, coatings and adhesives.  The principal application of MMA is the production of acrylic plastics and resins for

sheeting and molding compounds, which are used, among other applications, in construction, coatings, adhesives, inks, sealants, baths, sinks, spas, hot tubs, signs, lighting, worktops, appliances, lenses, architectural applications, medical instruments, clear plastic automobile parts, and mobile phone screens.

35.     The MMA industry has a number of structural and other characteristics that facilitate the implementation and maintenance of a horizontal price-fixing conspiracy such as that alleged by Plaintiff herein, specifically:

a.     MMA is a commodity product that is fungible in the sense that MMA manufactured by any Defendant is readily substitutable with the MMA manufactured by any other Defendant.  MMA is a highly homogeneous product sold by Defendants and purchased by Plaintiff and members of the Classes primarily on the basis of price.

b.     The MMA industry in the United States is highly concentrated, facilitating coordination of MMA prices among the major manufacturers thereof.  During the Class Period, Defendants accounted for virtually all MMA production in the United States.

c.     There are substantial barriers to entry in the MMA industry.  Entry into the industry requires a substantial sunk investment and a significant period of time.  The minimum viable scale of a new MMA production facility is very large and extremely costly.  Similarly, viable entry requires that a new producer capture a significant market share from existing producers.  Thus entry is both expensive and risky.  Moreover, overcapacity, as well as announced expansions by existing producers, served as additional deterrents to entry during the Class Period.  In fact, no entry occurred during the Class Period.

## VIOLATIONS ALLEGED

36.    In formulating and effectuating the contract, combination or conspiracy alleged above, Defendants and their co-conspirators, among other things:

a.    Agreed to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of MMA sold in the United States;

b.    Exchanged sensitive confidential information relating to prices and customers;

c.    Monitored and implemented collusive arrangements among cartel members; and

d.    Sold MMA at agreed-upon prices.

37.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of MMA.

38.    Defendants' anti-competitive agreement was implemented by, *inter alia*, a series of coordinated price increase announcements that began in or about 1995. These coordinated price increases continued on a regular basis through at least 2003, with the actual and intended result that Plaintiff and members of the Class paid supra-competitive prices for MMA for nearly a decade. Defendants falsely attributed these price increases to increases in input costs such as raw materials, energy and labor.

39.    The conspiracy among Defendants is international in nature and scope. On their websites, many Defendants tout the global nature of their business and activities. The global MMA market is dominated by a small number of companies. Defendants viewed and treated the MMA market as a global market and, in fact, prices charged for MMA in the European Union

affected prices in the United States, and vice versa.  Defendants needed to, and did, collude in both regions in order to effectively collude in either region.

## GOVERNMENTAL INVESTIGATION

40.     On August 22, 2005, the Reuters news agency reported that several European producers of MMA were being investigated by the European Commission ("Commission") for conspiring to fix prices of MMA.  According to the Reuters report, the Commission charged the companies with "fixing prices, allocating customers and passing on additional costs."   The companies purportedly "exchanged sensitive confidential market information so they could monitor each other's activities and enforce the cartel."  An August 29, 2005 article in Chemical and Engineering News reported that defendants Arkema, Degussa, ICI, Lucite and BASF had received letters from the EC detailing the charges against them.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

41.     Plaintiff and other members of the Class had no knowledge of Defendants' unlawful self-concealing conspiracy and could not have discovered the contract, combination or conspiracy at an earlier date by the exercise of due diligence because of the deceptive practices and secrecy techniques employed by Defendants to avoid detection of, and to fraudulently conceal, their contract, combination or conspiracy.

42.     Because the contract, combination or conspiracy was kept secret by Defendants, Plaintiff and other members of the Class were unaware that prices of MMA were secretly agreed upon until August, 2005, when certain Defendants for the first time disclosed that they had been charged by the Commission with collusion in relation to their pricing and marketing of MMA in Europe.  Before then, Defendants represented publicly, both to customers and otherwise, that their pricing activities relating to MMA were unilateral, rather than collusive, and based upon

legitimate factors, such as increased costs and other free market considerations. In making those false representations, Defendants misled Plaintiff and members of the Class as to the true, collusive and coordinated nature of their pricing and other illegal and anti-competitive activities. While Plaintiff diligently sought to protect itself from unlawful activity, Plaintiff and other members of the Class were unable, until August 2005, to detect the above-described secret activity, which by its nature was self-concealing.

43.     As a result of Defendants' fraudulent concealment of their conspiracy, the applicable statute of limitations governing Plaintiff's right of action has been tolled.

**EFFECTS**

44.     The unlawful contract, combination or conspiracy alleged above had, *inter alia*, the following effects:

a.     Prices charged by Defendants and their co-conspirators to Plaintiff and the members of the Class for MMA were maintained at artificially high and noncompetitive levels; and

b.     Plaintiff and members of the Class were required to pay more for MMA than they would have paid in a competitive marketplace, unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing.

45.     During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiff and members of the Class directly purchased MMA in the United States.

46.     Plaintiff and the other Class members paid more for the MMA that they purchased than they would have paid under conditions of free and open competition.

47.    As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determinable.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

49.    Plaintiff brings this action on its own behalf and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class:

> All persons (excluding governmental entities, Defendants, co-conspirators, other producers of MMA, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased MMA in the United States directly from any of the Defendants or their co-conspirators, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from January 1, 1995 through December 31, 2003.

Plaintiff believes that there are hundreds, if not thousands, of Class members as above described, the exact number and identities being known only by Defendants.

50.    The Class is so numerous and geographically dispersed that joinder of all members in impracticable.

51.    There are questions of law and fact common to the Class. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof. The questions include but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize prices of MMA sold in the United States;

b.     The identity of the participants in the conspiracy;

c.     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

d.     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

f.     The effect of Defendants' conspiracy on the prices of MMA sold in the United States during the Class Period; and

g.     The appropriate measure of damages sustained by Plaintiff and other members of the Class.

52.     Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of other Class members, and Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is a direct purchaser of MMA from one or more of the Defendants. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. In addition, Plaintiff is represented by competent counsel experienced in the prosecution of antitrust and class action litigation.

53.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

54.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

55.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records exist in the files of Defendants and their co-conspirators.   Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that:

A.    The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.    The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U. S.C. § 1.

C.    Judgment be entered for Plaintiff and members of the Class against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

D.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

(1)      Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(2)      Communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of any product except to the extent necessary in connection with a bona fide sales transactions between the parties to such communications.

E.      Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: _February 7_, 2006

Respectfully submitted,

**BOLOGNESE & ASSOCIATES, LLC**

By: _Joshua H. Grabar_

Anthony J. Bolognese (AJB3935)
Joshua H. Grabar (JHG1707)
Michael Gehring
1617 JFK Blvd., Suite 650
Philadelphia, PA 19103
Telephone: (215) 814-6750
Facsimile: (215) 814-6764

Steven O. Sidener
Joseph M. Barton
**GOLD BENNETT CERA
    & SIDENER LLP**
595 Market Street, Suite 2300
San Francisco, CA  94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

**Attorneys for Plaintiff and the Class**